UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>AGILENT TECHNOLOGIES, INC., et al.,<br><br>　　　　　　Defendants. | Case No. 18-cv-01199-VC<br><br>**ORDER #3 RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 106, 114, 120, 123 |

　　　　This is the third order to address the cross motions for summary judgment filed by Stanford and HP/Agilent (Dkt. Nos. 106, 123). The cross motions between HP and Nokia (Dkt. Nos. 114, 120) are moot due to a settlement between the parties (Dkt. Nos. 183, 185). Part I of this order addresses the main issues that remain in Stanford's motion. Stanford's motion is denied on those issues. Part II addresses three issues that remain in HP's cross-motion. HP's motion is denied on those issues. Although the parties have raised several issues in their motions beyond those addressed here, all agreed at oral argument to limit the scope of the motions to the issues discussed in this ruling. Thus, the motions as to all issues not discussed are denied as moot.

I.

　　　　Stanford's SJ Motion, Part III.B (Dkt. No. 106). Stanford moves for summary judgment as to HP's liability under CERCLA for assessment and evaluation costs relating to the hazardous substances identified on the property. Private plaintiffs seeking recovery under CERCLA must prove several elements, two of which are relevant today. The plaintiff must show that there was a

"disposal" during the defendant's control of the property. *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 874 (9th Cir. 2001) (en banc). Even then, a plaintiff seeking private party response costs may recover only "necessary costs of response . . . consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(B). Stanford's motion is denied because a genuine dispute exists as to whether there has been a "disposal" and for the additional reason that Stanford has not shown compliance with the national contingency plan.

First, the "disposal" requirement. CERCLA adopts the definition of disposal provided in the Solid Waste Disposal Act. *Id.* § 9601(29). That Act defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any . . . hazardous waste into or on any land . . . so that such . . . waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters." *Id.* § 6903(3). The term "disposal" is not limited "to the initial introduction of hazardous material onto property." *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.*, 976 F.2d 1338, 1342 (9th Cir. 1992). Earthmoving activities that "spread" hazardous material "over uncontaminated portions" of property count too. *Id.*; *see also PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 177 (4th Cir. 2013) (collecting cases).

The record evinces a genuine dispute about whether HP spread PCB over uncontaminated areas of Stanford's property. All agree that HP dug a trench in 1987 to lay a storm drain. R.109-1 at 8; R.128 at 2. And all agree that HP removed dirt to dig the trench. R.128 at 3; R.115-8 at 14–15. But the parties contest whether HP, in removing the dirt, simply stockpiled it alongside the trench before backfilling the area, or instead redistributed any of the hazardous soil to other parts of the property. R.115-8 at 15. Both sides have submitted competing expert evaluations and hotly contest how exactly HP handled soil on the property in 1987. The issue is not suitable for resolution on a motion for summary judgment.

Stanford argues that even if HP only removed the soil, stacked it next to the trench, and then refilled the trench with that same soil, it still disposed of PCB on the property. And, Stanford points out, HP admits that it did at least that. But "disposal" does not stretch quite so

far. The statutory text defines disposal as "discharge, deposit, injection, dumping, spilling, leaking, or placing." 42 U.S.C. § 6903(3). Each of those terms connotes moving matter from one place to another. Precedent confirms what the text suggests. Where there has been no "movement of contaminated soil," the Eleventh Circuit has said, no "disposal" has occurred. *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1510 (11th Cir. 1996). In *Redwing*, the evidence suggested that the defendant dug "through soil" to service a gas line. *Id.* Because "the only reasonable inference" suggested that "any soil dug up during the process was returned from whence it came," the Circuit concluded that "this conduct did not amount to a 'disposal.'" *Id.* at 1510–11.

*Kaiser* does not say otherwise. The Ninth Circuit held that the plaintiff stated a claim by alleging that the defendant "excavated the tainted soil, moved it away from the excavation site, and spread it over uncontaminated portions of the property." *Kaiser*, 976 F.2d at 1342. That case does not stand for the proposition that refilling a hole with temporarily stockpiled soil counts as a "disposal." *Cf. Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988) (holding that "those who move the waste about the site may fall within the terms of the provision"). If temporarily lifting soil and backfilling the same hole with the same soil counts as a "disposal," CERCLA would hold liable the unassuming gravedigger or random sandcastle-builder. The statute requires at least some movement of contamination.

Nor has Stanford shown that there is no genuine dispute as to whether HP disposed of TCE on the property. There is circumstantial evidence supporting Stanford's view that HP disposed of TCE: the record shows that HP used TCE in the 1970s and TCE was detected in the soil near the chemical storage area on the property. R.107-1 at 8. But HP presents admissible evidence that a prior occupant is responsible for the TCE contamination, having used the same chemical storage area. R.115-9 at 27; R.127 at 3. A trier of fact will need to sort out whether the evidence is strong enough to support a finding that HP is responsible for any TCE contamination identified on the property.

Next, even if it were clear at this stage that HP had disposed of contaminated material,

3

Stanford has failed to show that it incurred costs "consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(B). Stanford insists that although compliance with the plan is a prerequisite to recovering actual cleanup costs, it is not a prerequisite to recovering assessment and evaluation costs. *See* R.106 at 16 n.3. For support, it cites *Palmisano v. Olin Corp.*, which noted that "investigatory costs are generally recoverable irrespective of their consistency with the NCP." 2005 WL 6777560, at *19 (N.D. Cal. June 24, 2005). There are reasons to doubt *Palmisano*'s statement. The statute's text, for starters, does not differentiate between initial assessment and evaluation costs and other kinds of costs. Private parties may recover "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). The statute then defines "response" as "remove, removal, remedy, and remedial action." *Id.* § 9601(25). In turn, "remove" or "removal" means, among other things, "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." *Id.* § 9601(23). The "costs of response" thus include actions to "assess" and "evaluate," which means that the statute's plain terms require that assessment and evaluation costs be consistent with the national contingency plan. The Ninth Circuit has confirmed the point by reading "CERCLA's cost recovery provisions as making no distinction between cleanup and investigatory costs." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 581 (9th Cir. 2018).

Note too that *Palmisano* relied on only a handful of cases, and just one appellate decision, *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926 (6th Cir. 2004), to conclude that NCP costs need not align with the national contingency plan. But in *K-H Holding*, the Sixth Circuit noted that it could find "nothing in CERCLA that exempts" monitoring and investigation costs "from the requirements of the NCP." *Id.* at 934 n.l. First principles aside, the circuit was "bound to follow" a prior panel decision offering just bare consideration of the issue. *Id.*; *see Donahey v. Bogle*, 987 F.2d 1250, 1255–56 (6th Cir. 1993), *vacated on other grounds sub nom. Livingstone v. Donahey*, 512 U.S. 1201 (1994).

Stanford argued at the hearing that the statute's text is beside the point because the national contingency plan does not speak to assessment and evaluation costs. But that seems

wrong. The plan provides that "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements" in subsections (c)(5) and (c)(6) "and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). Those subsections relate, at least in part, to assessment and evaluation costs. One subsection refers to "provisions" that "are potentially applicable to private party response actions," including "removal site evaluation." *Id.* § 300.700(c)(5)(v) (citing *id.* § 300.410, excluding paragraphs (f)(5) and (6)). Another explains that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action." *Id.* § 300.700(c)(6). By its terms, the plan seems to include requirements that come into play in incurring assessment or evaluation costs. *See Board of County Commissioners of County of La Plata v. Brown Group Retail, Inc.*, 768 F. Supp. 2d 1092, 1115 (D. Colo. 2011) ("I conclude that the plain language of CERCLA dictates that NCP consistency is a prerequisite to the recovery of investigatory costs associated with the release of a hazardous substance."); *Angus Chemical Co. v. Mallinckrodt Group, Inc.*, 1997 WL 280740, at *1 (W.D. La. Mar. 4, 1997) ("To distinguish investigative and monitoring costs from the standards applicable to other types of response costs, and allow their recovery regardless of compliance with the NCP or the recovery of other response costs, directly contravenes the plain language of the Act."). *But see MPM Silicones, LLC v. Union Carbide Corporation*, 2016 WL 3962630, at *24 n.39 (N.D.N.Y. July 7, 2016) (collecting cases holding that plan consistency is not required), *vacated on other grounds*, 966 F.3d 200 (2d Cir. 2020).

It may well be that Stanford incurred costs entirely consistent with the national contingency plan. Indeed, it does not seem difficult, given the relative vagueness of the provisions in the NCP that relate to assessment and evaluation, to demonstrate that costs on these areas are "consistent" with the plan. But at this stage Stanford has not brought forward any evidence showing compliance, so it would not be entitled to summary judgment on this issue even if it had proven definitively that HP disposed of hazardous waste at the facility.

II.

1. HP's Cross SJ Motion, Part IV.A.3 (Dkt. No. 145-1). HP's motion for summary judgment as to the necessity of Stanford's removal costs is denied. The statute permits private parties to recover "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B). The "touchstone for determining . . . necessity," according to the Ninth Circuit, "is whether there is an actual threat to human health or the environment." *Carson Harbor*, 270 F.3d at 867. That a party might also have "a business reason for the cleanup" does not negate necessity. *Id.* The focus is "not on whether a party had a business or other motive in cleaning up the property," but is instead on whether there is an objective health threat. *Id.* at 872; *see also Pakootas*, 905 F.3d at 582; *Johnson v. James Langley Operating Co., Inc.*, 226 F.3d 957, 963 (8th Cir. 2000).

With the Ninth Circuit's framing in mind, HP is wrong to argue that a cost is not "necessary" within the meaning of the statute if the property owner incurred it as part of an "upgrade" in the use of the property. HP cites *G.J. Leasing Co., Inc. v. Union Electric Co.*, in which the Seventh Circuit mused that if recovery were not limited to costs necessary for making the property safe for its existing use, "there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else." 54 F.3d 379, 386 (7th Cir. 1995). A plaintiff could, for instance, spend far more money to clean up far more pollution, all because it wants to turn an industrial warehouse into a "hospital" or "dairy products plant." *Id.* But the Ninth Circuit's reading of "necessary" is hard to square with that approach. The Ninth Circuit has admonished that necessity does not turn on ulterior business reasons, nor on the plaintiff's subjective motivations. *Carson Harbor*, 270 F.3d at 867. What matters is the objective threat contamination poses to health or the environment.

The approach advocated by HP would severely constrain the property rights of CERCLA plaintiffs, in a manner that seems inconsistent with the statute. Just look to this case. Stanford decided—presumably to address a faculty housing shortage—to convert its real estate into residential homes. There is nothing unusual about tearing down an old office space or industrial warehouse to make way for new housing. HP's view of CERCLA would prevent property owners from doing what so often proves necessary as decades pass and needs change: convert

land from one use to another. Stanford may have had an "ulterior motive" in cleaning up the land, but that does not categorically bar recovery. If someone contaminates a property owner's land in a way that prevents the owner from putting the property to a desired use (even if the desired use is different from how the property was being used at the time of the contamination), the contaminator is generally responsible for the cleanup costs.

HP made a related argument during the hearing: regardless of motive, a property owner cannot recover costs under CERCLA where it changes the traditional and longstanding use of its property. In other words, HP contends, CERCLA contains a bright-line rule that: (i) an owner may recover cleanup costs necessary to allow the property to continue to be used in the way the owner was using it when the contamination occurred; but (ii) an owner may not recover cleanup costs associated with changing the use of the property. So where a property owner shifts the use case of their property, say from industrial to residential, HP contends that CERCLA categorically bars recovery of costs associated with that change. But again, this argument finds no support in the text or purposes of CERCLA, unduly constrains the rights of property owners, and cuts against Ninth Circuit precedent. Property owners are well within their rights to modify the use of their property over time.

There may well be outer limits on the costs a plaintiff might recover. Were Stanford to have spent massive sums cleaning up every iota of potential contamination for a quirky purpose such as constructing a wading pool for infants or a building museum of the world's cleanest soil, HP's argument might be appropriate. But Stanford's desired use of the property was well within the range of normal things that owners do with their property, and thus cleanup costs associated with desired use are "necessary" within the meaning of the statute.

2. HP's Cross SJ Motion, Part V.C (Dkt. No. 145-1). A genuine dispute exists as to whether Stanford consented to the disposal of hazardous material on its property, so HP's motion for summary judgment on the state law claims based on consent is denied.

HP argues that Stanford consented to the disposal of hazardous materials by approving HP's excavation activities and by failing to take immediate action after learning about

contamination. R.192-1 at 23. Consent is a valid defense to nuisance and trespass. But approving activities on a property is not the same as consenting to contamination resulting from those activities. In *Mangini v. Aerojet-General Corp.*, the lease included a clause acknowledging "that certain activities" of the lessee "may be of a hazardous nature and that from time to time activities conducted on the premises may have an element of nuisance about them or resulting from them." 230 Cal.App.3d 1125, 1140 (Cal. Ct. App. 1991) (quoting the lease at issue). Still, the California appeals court found that the lease was "patently ambiguous with respect to whether the lease authorized hazardous waste disposal." *Id.* The lease did not, for instance, "identify either the nature of the contemplated hazardous activity nor the nature of the contemplated nuisance." *Id.* In short, that Stanford consented to HP's use of the property for its manufacturing activities does not mean, as a matter of law, that Stanford consented to HP's disposal of hazardous materials associated with those activities.

       HP cites California's lead paint cases, arguing that where a plaintiff has consented to bring a product onto their property, they cannot bring a trespass action upon discovering the product is defective. In *County of Santa Clara v. Atlantic Richfield Co.*, a California appeals court rejected trespass claims brought by municipalities against lead paint manufacturers: "The flaw in the proposed trespass cause of action is that . . . the lead was placed on plaintiffs' property *by plaintiffs* or with their consent." 137 Cal.App.4th 292, 314–15 (Cal. Ct. App. 2006). *Santa Clara* stands for the proposition that "[w]here the owner of property voluntarily places a product on the property and the product turns out to be hazardous, the owner cannot prosecute a trespass cause of action against the manufacturer of that product because the owner has consented to the entry of the product onto the land." *Id.* at 315. By cabining trespass claims for products that a plaintiff brings onto their own property, *Santa Clara* prevents property owners from turning mine-run product liability claims into trespass actions. But this case is different. Stanford did not bring the contaminants onto its own property. Nor is it attempting to hold HP liable for product defects arising on its land. Perhaps Stanford's particular level of knowledge regarding HP's activities on the site could result in a finding of fact that Stanford consented, but

8

the basis HP now offers for summary judgment on that issue is invalid.

3. HP's Cross SJ Motion, Part V.G (Dkt. No. 145-1). HP's cross motion barring Stanford from recovering attorney's fees is denied. At this stage in the litigation, it remains unclear exactly how Stanford would seek recovery of attorney's fees under California law. But that is an issue that can be settled after trial. Should Stanford prevail, it can bring a motion to recover attorney's fees, at which point the issue can be more fully briefed and decided.

**IT IS SO ORDERED.**

Dated: December 2, 2021

VINCE CHHABRIA
United States District Judge